Joseph H. Low IV (SBN 194897)
THE LAW FIRM OF JOSEPH H. LOW IV
100 Oceangate, 12th Floor
Long Beach, CA 90802
Telephone: (562) 901-0840
Facsimile:  (562) 901-0841
joseph@jhllaw.com


Attorney for Plaintiffs


IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA- SAN FRANCISCO DIVISION

| | |
|---|---|
| MARK ADAMS, CORY BRANDON, JOHN CAMPERLINO, RYAN CARVER, KELVIN CHAISSON, DERRICK CHERRY, ZEBADIAH CORNIST, QUINTON ECHOLS, SIMSON GREEN, KEITH JACK, JAMAAL JOHNSON, JORDY JOHNSON, JOSEPH CHARLES LEWIS, III, CHRISTOPHER LIGON, BRANDON LOGAN, DEMARR LOVE, STEPHEN MCPETERS, BOBBY MEEKS, JERMAINE MILLS, BYRON NEWMAN, DOMINIC PATRICK, MARK POTTER, JARROD BLAKE ROBERTS, ARMANDO ROMAN, JERMAINE SMITH, MICHAEL STERNS, STACEY THOMAS, CHRISTOPHER THOMPSON, TARIQ VLAUN, JOSEPH WALKER, JOHNNY WILLIAMS, LES WILLIAMS, YASHUA WILLIAMS, JEFFRY WODKA, <br><br>                    Plaintiffs, <br>          vs. <br><br> BRG SPORTS, INC, RIDDELL, INC., ALL AMERICAN SPORTS CORPORATION d/b/a RIDDELL/ALL AMERICAN, formerly known as RIDDELL SPORTS GROUP, INC., <br><br>                    Defendants. | CASE NO: 3:17-cv-00457 <br><br> **COMPLAINT FOR DAMAGES** |

///

# ORIGINAL COMPLAINT

COME NOW Plaintiffs to file this Original Complaint against the Defendants BRG Sports, Inc., Riddell, Inc., All American Sports Corporation d/b/a Riddell/All American, formerly known as Riddell Sports Group, Inc. (collectively "Riddell" or "Defendants") and respectfully state:

## I.

## OVERVIEW OF THE ACTION

A.    **Case Overview**

1.    According to the world's largest football helmet maker Riddell:
THE GAME OF THE FUTURE WILL BE WON **WITH THE BRAIN**. AND THE HELMET, **THE SPACE TO WHICH <u>WE HOLD THE RIGHTFUL OWNERSHIP</u>**, IS THE **HOME OF THE BRAIN**. THAT SPACE MOST REPRESENTS THE FUTURE OF THE GAME.[1]

2.    Riddell betrayed this self-declared ownership as the protector of its customers' brains and well-being, when it knowingly and negligently developed, designed, tested, marketed, promoted, advertised, distributed and sold dangerous and defective football helmets that lacked critical and accurate safety information relating to the products. As a direct result of Riddell's wrongful misconduct and omissions, Plaintiffs have suffered permanent injuries and/or were left at an elevated risk for grievous injuries and latent damages to brain.

3.    As a result of Riddell's bad acts, discussed in detail below, this lawsuit seeks to recover damages for injuries sustained by the Plaintiffs as the direct and proximate result of the negligent and wrongful misconduct of Riddell in connection with the development, design, promotion, marketing, and sale of Riddell football helmets to Plaintiffs.

4.    Riddell failed to disclose and warn that the helmets they marketed and sold did not perform in the manner they claimed they could and would.  Namely, Riddell represented their helmets would protect players from head trauma, repetitive head impacts, and concussions. In reality, Riddell knew this was false, and failed to take effective action to protect Plaintiffs or

---

[1] http://www.riddell.com/history (last visited 1/10/17) (emphasis added).

inform them of the true risks and dangers associated with concussions, brain injuries, and repetitive brain trauma—all of which were known or should have been known to Riddell.

**B.     Riddell's history.**

5.     For decades, Riddell has designed, manufactured, sold, and distributed athletic equipment, especially football helmets to the collegiate players, the NCAA member schools, high schools, and youth leagues throughout the United States.

6.     Riddell claims it "the premier designer and developer of protective sports equipment" and touts that it was founded in 1929 as a company "dedicated to innovation, protection and performance" of its customers.[2]  Riddell claims that its foray into football helmet manufacturing beginning in 1939 was a "wipe-the-slate-clean, make-a-difference moment" in helmet technology.[3]  Riddell became a marketing juggernaut when it "created one of the strongest branding placements in all sports for all to see every Saturday, Sunday and Monday" by placing its name "between the screws" of football helmets it marketed to college and NFL players that would be seen on television.[4]

7.     Recognizing that football over the past several decades can only be described as "BIGGER, FASTER, STRONGER," Riddell placed on itself a duty to protect the players buying and wearing its products, claiming that in light of the speed of the modern game, "Riddell is the pioneer of ***innovating for the good of the player***."[5]  Riddell has claimed and still claims it is the "recognized leader in helmet technology and innovation for athletes at all levels of football."[6] Plaintiffs wore Riddell helmets at all times while playing and/or practicing during their collegiate careers.

8.     It is (and was) vital to the safety of the players that Riddell act reasonably, through research, studies, testing and other means, to help identify the risks of serious injuries associated with playing football with their helmets; to keep the teams and players that use their

---

[2] http://www.riddell.com/history (last visited 1/10/17).
[3] *Id.*
[4] *Id.*
[5] *Id.* (emphasis added).
[6] *Id.*

helmets informed of the risks; and to take reasonable steps based upon their findings to protect and educate players who rely on their helmets to protect them.

9.      Football players like Plaintiffs need safety equipment that performs in the manner that it is represented to perform. In instances where there are inherent dangers, or where the safety equipment does not provide sufficient protection from these inherent dangers, the equipment manufacturers and sellers must provide clear, easily understandable, and easily seen warnings.

**C.    Riddell's misleading marketing and labelling.**

10.     Beginning in 1983, warning labels first were placed onto the backs of Riddell's helmets. At that time, and until the 1990s, the helmets bore roughly postage-stamp-sized warnings, containing the following text, with no express mention of concussions:

> Do not use this helmet to strike an opponent. Such an action is against football rules and may cause severe brain or neck injury. Playing the game of football in itself can cause injury, and no helmet can prevent all such injuries.[7]

11.     Since at least 2002, Riddell began to hold itself out as making "the only advancement in helmet technology" in two decades, and specifically referenced concussion reduction capabilities. Hoping to profit from the growing concern over concussions and head injuries, Riddell claimed that they had created a football helmet that would provide a player with a *safer* helmet that would protect the player from concussions as compared with other helmets available on the market during the same time.

12.     Riddell claimed that its "Riddell Revolution Helmet" was proven to be 31% safer than other helmets available at the time. Riddell knew or had reason to know that these representations about the increased protection offered by Riddell's Revolution were false, and

---

[7] This warning implied that the Riddell helmet could prevent many such injuries, including concussions. Since approximately 2003, Riddell's chief competitor in the football helmet market, Schutt Sports, offered on its labels the following warning: "No helmet system can protect you from serious brain and/or neck injuries including paralysis or death. To avoid these risks, do not engage in the sport of football."  *See* Belson, K., "Warning Labels on Helmets Combat Injury and Liability," New York Times (Aug. 4, 2013).

after a Federal Trade Commission investigation, were forced to stop making that marketing claim.[8] Riddell knew or had reason to know that their representations would never be questioned by the community of consumers and the players who wore these helmets, because the community and the players relied upon and trusted Riddell.

13.    The Revolution line of helmets also contain common inherent design defects, including:

a.    a defective rear and/or side padding liner system that fails to incorporate newer, safer and better energy absorbing materials such as air-filled chambers and/or thermoplastic polyurethane ("TPU") padding that have been shown to substantially reduce the forces transmitted to a player's head from both linear and rotational impacts thereby mitigating the risk of injury i.e. concussions.

b.    defective padding that cannot absorb most football blows without distributing acceleration onto the head of the player.

c.    substandard foams in the front pad rather than available newer materials that perform better at attenuating energy by reducing force to the forehead.[9]

14.    Nevertheless, Riddell marketed all of their helmets as safe and/or safer equipment that would protect its players, especially from concussions.

15.    Riddell had superior knowledge to that of Plaintiffs of the risks that would come from wearing the Riddell helmets, based on Riddell's own studies and testing, yet Riddell failed in their duty to warn the athletes. Riddell's conduct constitutes negligence.

16.    Riddell breached their duty to educate, protect and adequately warn college football players in the face of long-standing and overwhelming evidence regarding the dangerous risks posed by repetitive head trauma known to Riddell. Riddell has profited immensely their inactions, misrepresentations and falsehoods, all to the detriment of the Plaintiffs who relied upon them for accurate and truthful information concerning the safety of their products.

---

[8]https://www.ftc.gov/sites/default/files/documents/closing_letters/riddell-sports-group-inc./130430riddellvillafrancoltr.pdf
[9] The proper selection of foam padding for the liner system is extremely important because players sustain the majority of impacts to the forehead area, which is also the thinnest layer between the skull and brain.

17.     The Plaintiffs each suffered the adverse consequences proximately caused by Riddell's negligence, failure to warn, design defects, and Riddell is strictly liable for Plaintiffs' injuries.

## II.

## JURISDICTION AND VENUE

18.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 as Plaintiffs are residents of Texas, Georgia, Oklahoma, Tennessee and Alabama, while Defendants are residents of California, Delaware, and Illinois.  The amount in controversy exceeds $75,000 as to each named Plaintiff.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) and 1391(c) as the Defendants are deemed to reside in this judicial district because they are subject to personal jurisdiction here; and a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction and the Defendant conducts substantial business in this jurisdiction.

## III.

## PARTIES

20.     Plaintiffs former collegiate athletes now suffering from several symptoms indicative of long-term brain and neurocognitive injuries resulting.  Plaintiffs are residents of Texas, Louisiana, Georgia, Tennessee and Alabama.  Plaintiffs respectively played college football at different colleges and universities, including University of Texas, University of Oklahoma, University of Alabama, Florida State, Grambling, Kansas State, University of Arizona, Iowa State, and others.  However, each Plaintiff wore Riddell helmets at the times relevant to this suit.

21.     Defendant BRG Sports, Inc., formerly known as Riddell Sports Group, Inc. is a Delaware Corporation with its principal place of business in California, and may be served through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 2710 Gateway Oaks Dr., Suite 150N, Sacramento, California 95833.

22.     Defendant Riddell, Inc. is a corporation organized and existing under the laws of the State of Illinois and whose principal place of business is in the State of California. Riddell, Inc. is a wholly owned subsidiary of BRG Sports, Inc., and may be served through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620 Austin, Texas 78701-3218.

23.     Defendant All American Sports Corporation, doing business as Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware and whose principal place of business is in California. All American Sports Corporation is a wholly owned subsidiary of Riddell Sports Group, Inc., and may be served through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 2710 Gateway Oaks Dr., Suite 150N, Sacramento, California 95833.

24.     Defendants Riddell, Inc., All America Sports Corporation d/b/a Riddell/All America, and BRG Sports Group, Inc. are collectively referred to as "Riddell."

**IV.**

**FACTUAL BACKGROUND**

**A.    Primer on Concussions.**

**1.    Concussions and what they cause.**

25.     The brain is made of soft tissue and is cushioned by spinal fluid. It is encased in the hard, protective skull. When a person gets a head injury, the brain can slosh around inside the skull and even bang against it. This can lead to bruising of the brain, tearing of blood vessels, and injury to the nerves. When this happens, a person can get a concussion – a temporary loss of normal brain function.

26.     A concussion or mild traumatic brain injury ("MTBI") has been defined as "a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces." In simple terms, a concussion is an injury to the brain that may result in temporary or permanent loss of normal brain function.

27.     The milder indications of a concussion include headaches, lack of concentration, problems with memory and judgment, lack of coordination and difficulty with balance. The more

significant effects can include Post-Concussion Syndrome ("PCS"), Chronic Traumatic

Encephalopathy ("CTE") and Second Impact Syndrome ("SIS").

     **2.**     **Signs and symptoms of concussions.**

     28.     Although a concussion is commonly perceived as causing loss of consciousness

(passing out), a person can have a concussion and never lose consciousness. As the Southern

Collegiate Athletic Conference and the NCAA know or should know, symptoms of a concussion

may include:

        "seeing stars" and feeling dazed, dizzy, or lightheaded;

        memory loss, such as trouble remembering things that happened right before and after the injury;

        nausea or vomiting; headaches;

        blurred vision and sensitivity to light;

        slurred speech or saying things that don't make sense; difficulty concentrating, thinking, or making decisions;

        difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks); and

        feeling anxious or irritable for no apparent reason; or feeling overly tired.

     29.     The general public, including former football players, may not recognize the signs

of a concussion. In fact, a concussion may prevent a player from recognizing that one has a

concussion, or the lingering symptoms, since by definition a concussion is brain impairment.

And because of that, student-athletes may put themselves at risk for another injury. For example,

players may return to a game before they should, thinking nothing is wrong.  That is a problem

because if a player's brain has not healed properly from a concussion and the player then

receives another brain injury (even if it is with less force), it can be serious.

     30.     Repeated injury to the brain can lead to swelling, and sometimes people develop

long-term disabilities, or even die, as a result of serious head injuries. It is therefore very

important to recognize and understand the signals of a concussion.

///

31.     When post-concussion symptoms persist beyond a month, most refer to this condition as post-concussion syndrome (PCS). PCS symptoms can include headaches, fatigue, memory problems, feeling in a fog, depression, impulsivity, and other physical, cognitive, mood, and behavioral problems.

### 3.    Chronic Traumatic Encephalopathy or CTE.

32.     CTE is a progressive neurodegenerative disease caused by repetitive trauma to the brain which eventually leads to dementia and other neurological disorders. Often there can be a delay of years or even decades between the end of the repetitive head impacts (*i.e.*, the end of playing football) and the beginning of the symptoms. CTE often presents with recent memory loss and other cognitive impairments similar to those experienced by people with Alzheimer's disease.  People with CTE can also have changes in behavior (*e.g.,* impulsivity, rage, aggression, having a short fuse) and mood (*e.g.,* depression, hopelessness, feeling suicidal).

### 4.    Second-Impact Syndrome or SIS.

33.     When athletes who have sustained a concussion return to competition too soon, they risk the occurrence of SIS, a condition that can cause serious head trauma or even death.[10] SIS occurs when an athlete sustains a second blow to the head before the symptoms from the first concussion have subsided, or before the brain has fully recovered.  The second injury may occur within minutes, days, or even weeks after the first, and still have a devastating effect.

34.     Even a relatively light hit, if sustained during this vulnerable post-concussion period, may spark the onset of SIS. The second impact causes rapid swelling of the brain, resulting in cerebral edema. When the brain swells, the pressure inside the skull increases, preventing blood flow to the brain and decreasing the brain's essential oxygen levels, causing

---

[10] *See AAN Statement* at 581 (recognizing cumulative damage of multiple concussions); *Handbook*, *supra* ¶ 37, at 53 ("There are potentially serious complications of multiple or severe concussions, including second impact syndrome, postconcussive syndrome, or post-traumatic encephalopathy"); *see also* Sean Gregory, *Study: Kids Competing Too Soon After Concussions*, TIME (Jan. 21, 2009), http://www.time.com/time/magazine/article/0.9171. 1873131,00.html (reporting on concussion study by the Center for Injury Research and Policy at Nationwide Children's Hospital that found half of concussed student-players returned too soon to play).

substantial injury or death.[11]

### 5. The brain.

35. The brain has three main parts – the cerebrum controls higher mental functions, such as thought, memory, and language; the cerebellum controls balance and coordination; and the brainstem controls bodily function such as breathing, heart rate, and blood pressure.

36. A number of structures surround the brain to keep it safe. It is encased in the skull to protect it from outside sources; it has supporting tissues to help stabilize it; and, it is covered on all sides by three membranes and a layer of fluid. For this reason, it is often said that the brain "floats" inside the skull.

37. As a result, injuries to the brain occur when the head suddenly stops moving, but the brain, which was traveling at the same speed as the head, continues to move and strike the inside of the skull, transferring part of the force to the brain. This occurs most commonly when a blow is given to the head, and can also occur when the head is forced to accelerate or decelerate rapidly which can lead to bruising of the brain, tearing of blood vessels, and injury to the nerves. When this happens, a person can get a concussion – a temporary loss of normal brain function.

38. The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

///

---

[11] Cantu RC: Second Impact Syndrome a risk in any contact sport. *Physician and Sports Medicine* 23:27 (1995); see also, *Brain and Nervous System Health Center: Brain Swelling,* WebMD, http://www.webmd.com/brain/brain-swelling-brain-edema-intracranial-pressure?print=true (last updated Mar. 2, 2010) (describing brain swelling).

**6.        After a concussion.**

39.        After a concussion, the brain needs time to heal until all symptoms of a concussion have cleared up before returning to normal activities. The amount of time someone needs to recover depends on how long the symptoms last. Healthy teens can usually resume their normal activities within a few weeks, but each situation is different. A doctor should monitor the athlete closely to make sure it is appropriate to return to the game.

40.        Someone who has had a concussion and has not recovered within a few months is said to have post-concussion syndrome. The person may have the same problems described earlier – such as poor memory, headaches, dizziness, and irritability – but these will last for longer periods of time and may even be permanent.

41.        If someone has continuing problems after a concussion, the doctor may refer him or her to a rehabilitation specialist for additional help.

**B.        Long-Term Effects of Concussions.**

42.        Several major studies of the long-term effects of concussions have been conducted by Boston University's Center for the Study of Traumatic Encephalopathy, the Brain Injury Research Institute, the Veterans' Administration, and other institutions. These studies have revealed the "devastating consequences" of repeated concussions, including an increased risk of depression, dementia, and suicide.

43.        Further, the studies have demonstrated the physiological effect of multiple hits on the brain, manifested by red flecks of protein deposits on the brain called present with CTE. Generally, these proteins appear when the brain is hit, and disappear as healthy brain cells devour them, leading to recovery. Yet, when the brain suffers too many blows, the brain cells cannot keep up with the protein and eventually give up and die, leaving just the red flecks associated with CTE.

44.        Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Four of the five brains showed "the telltale red flecks of abnormal protein" characteristic of CTE. Dr. McKee, of the Boston University Center has

COMPLAINT FOR DAMAGES
3:17-cv-00457

examined the brains of 16 former athletes, and found CTE in all of them. Their research demonstrates how devastating multiple concussions are to the brain and to human function, and reiterates the need for concussion awareness, management, and prevention.

45.    Published peer-reviewed scientific studies have long shown that concussive and sub-concussive head impacts while playing football are linked to significant risk of permanent brain injury. This head trauma, which includes multiple concussions, triggers progressive degeneration of the brain tissue. The brain degeneration is associated with memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and eventually, progressive dementia.  As discussed in detail below, these publications have been available to the NCAA and member conferences for years, yet they failed to act in accordance with their duties to protect their players and warn them of the long-term.

46.    Most recently, the NFL, which for years disputed evidence that its players had a high rate of severe brain damage, stated in federal court documents that it expects nearly a third of retired players to develop long-term cognitive problems and that the conditions are likely to emerge at "notably younger ages" than in the general population. The NFL has agreed to a class settlement offering certain players with probable diagnoses of one or more long-term brain injuries compensation (between $1.5 million/player for the least severe, up to $5 million for Lou Gehrig's Disease). *See* Case No. 2:12-md-02323 (E.D.Pa.).[12] In addition, the NCAA has agreed to a class settlement for medical monitoring only of former NCAA athletes from a fund of up to $75 million, though no portion of that fund is to be paid for personal injuries to the athletes or even for their ongoing medical care.  *See* Case No. 1:13-CV-09116 (N.D. Ill.).

**C.    The role of helmets in preventing concussions.**

47.    The CDC estimates that 100,000 traumatic head injuries occur in football every year. The importance of understanding and preventing these head injuries is increasing because athletes have been getting "bigger, faster, and stronger," according to Riddell, resulting in more violent collisions that are more likely to cause concussions.

---

[12] *See also* https://nflconcussionsettlement.com/Home.aspx

COMPLAINT FOR DAMAGES
3:17-cv-00457

48.     The mechanisms underlying these concussions, as well as methods of prevention, have been investigated both in the laboratory and in the field.  Over the years, equipment changes have been proposed in an attempt to help prevent catastrophic brain injuries, including modifications of helmets and mouth guards. This equipment has been critical for injury prevention since helmets have been shown to protect against skull fracture, severe TBI, and death.

49.     Protective headgear and helmets decrease the potential for severe TBI after a collision by reducing the acceleration of the head on impact, thereby decreasing the brain-skull collision and the sudden deceleration-induced axonal injury. The energy-absorbing material within a helmet accomplishes this by compressing to absorb force during the collision and slowly restoring to its original shape. This compression and restoration prolongs the duration of the collision and reduces the total momentum or force transferred to the head.  The protective material in football helmets has evolved over time from inner suspension systems to traditional foam padding to gel-filled and inflatable padding.

50.     There are variations in helmet design based on the demands and constraints of each sport. Although helmets and headgear in most sports are good at mediating the high-impact collisions responsible for severe TBI, the question remains as to what extent the helmets and headgear of each sport are able to respond to the lower-impact collisions and rotational and linear acceleration forces responsible for concussions.

51.     Early helmets consisted of nothing more than leather padding but later designs began including metal, rubber, and plastics to provide additional protections. However, even these basic helmets were not required for college play until 1939 and were not mandated until 1940 for athletes in the NCAA.

52.     Despite innovations in helmet design, the incidence of head injuries continued to increase, prompting the formation of the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") in 1969 to initiate research efforts for head protection and to implement the first football helmet safety standards in 1973.

///

53.     The goal of NOCSAE was to develop a standard that would measure the ability of the football helmet to withstand repeated blows of various magnitudes under a wide variety of playing conditions without sacrifice in protective quality. Early helmet models were designed to protect areas of the player's head directly covered by the helmet from direct linear impact only.

54.     Since its inception, NOCSAE has been working to improve athletic equipment, and to reduce injuries through creating uniform standards for athletic equipment. Efforts include the development of performance standards for football helmets as well as research to better understand the mechanism and tolerance of head and neck injuries and the design and structure of football helmets.

55.     The NOCSAE helmet safety standards are voluntary test standards that have been developed to reduce head injuries by establishing requirements for impact attenuation for football helmets and face masks. Manufacturers test their own helmets to ensure they meet NOCSAE helmet safety standards, but it is mandatory for all football players to wear helmets bearing the NOCSAE certification seal.

56.     The NOCSAE organization is comprised of representatives from a number of national representative organizations that have an interest in athletic equipment and which include manufacturers, re-conditioners, athletic trainers, coaches, equipment managers, sports medicine doctors, and consumer organizations. The organization is funded with licensing fees collected from helmet manufacturers whose products bear the NOCSAE seal.

57.     NOCSAE does not possess a surveillance force to ensure compliance with its standards. NOCSAE receives no oversight from any independent agency, such as the Consumer Product Safety Commission or the Occupational Safety and Health Administration, and the standards are voluntary and are available for adoption by any equipment manufacturer, user group, or athletic regulatory body.

1.     **How Do You Measure Concussion Protection?**

58.     NOCSAE rates helmets numerically on a "Severity Index." Severity Index scores reflect how well helmets absorb the energy from an impact by measuring the effects on the head and brain.  The higher the score the greater and potentially more damaging the effects.  In order

to obtain the NOCSAE certification seal, helmets are tested on a pass/fail standard. To pass, helmets must score below 1200 SI at all impacts.

59.    The current testing standard involves mounting a football helmet on a synthetic head model and dropping it a total of 16 times onto a firm rubber pad, including two each from a height of 60 inches onto six locations at ambient temperatures. Two 60-inch drops onto the side are also conducted immediately after exposure of the helmet to 120 degrees Fahrenheit for four hours.

60.    The NOCSAE standard was developed to reduce the incidence of traumatic brain injuries, like skull fractures and cervical spine injuries; however, these test methods *were not* explicitly developed with the goal of reducing MTBI and/or concussions. The NOCSAE standard SI threshold is well in excess of the values associated with concussions, and all adult helmets in use today vastly outperform the 1200 SI threshold.

61.    NOCSAE helmet standards have remained largely unchanged since 1973, with the exception of the SI ratings, which changed from 1500 SI to 1200 SI in the early 1990s. According to Mike Oliver, the executive director of NOCSAE, the group's standards do limit linear acceleration – one of the forces behind concussions – but is not designed to rate protection against concussions.

62.    In a November 2000 report sent to Defendants, Biokinetics (the biomechanics firm hired by Riddell) wrote that SI scores well below the 1200 mark still carried a high risk of concussion. The report concluded "a concussion is almost certain to occur at SI levels half that of the current NOCSAE standard."

63.    Elsewhere in the report, Biokinetics reported that a player wearing a helmet that scored 291 SI during an impact – well within the safety threshold – would have a 50 percent probability of suffering a concussion and a helmet that scored 559 SI during the same impact would carry a 95 percent risk of concussion.

///

///

///

15
COMPLAINT FOR DAMAGES
3:17-cv-00457

64.     Other studies have suggested that NOCSAE's SI index, which rates helmet protectiveness based solely on the risk of skull fracture, is insufficient as a stand-alone concussion or near-concussive injury risk metric.[13]

65.     The studies commissioned by Defendants sought to improve guidelines for improved helmet standards and also concluded that the contribution of rotational forces, which are not taken into account by the current SI ratings, play a significant role in the risk of concussion.

66.     Despite having this knowledge, Defendants have done little to improve upon the current NOCSAE standards and/or incorporate a higher standard of care in order to design and provide safer equipment and better protection to their helmet users.

67.     The ultimate goal of a helmet manufacturer should not be to simply design a helmet to pass the NOCSAE standards, but rather the goal of helmet design should be to identify and require better impact protection to better protect the player throughout the widest range of injurious impact conditions and mitigate the risk of head injuries during play.

68.     As a result of the increased awareness of concussions and antiquated standards for testing football helmets, NOCSAE has come forth with a revised football helmet standard that will require helmets to be tested for certain concussion causing forces *i.e.* linear and rotational forces. The revised standard was modified June 2015 and effective October 2015.

69.     Throughout the latter half of the 20th century and continuing to present day, the Riddell has designed, developed, manufactured, sold, and distributed equipment used in the NCAA, including equipment used by NCAA football players, including, but not limited to, the following:

　　　　a.     In the 1950s, Defendants manufactured a face-mask component for its helmets, which was eventually patented.

　　　　b.     In 1962, the Defendants used a "U" shaped nose protector with a shell (known as the TK2) molded out of polycarbonate. The Defendants also designed an open/closed cell foam and composite liner system for this model to increase the efficiency of the webbed suspension.

---

[13] A. Bartsch, *et al.*, *Impact Test Comparisons of 20th and 21st Century American Football Helmets*, J. Neurosurgery 116:222-233 (2012).

c.    In 1963, the Defendants developed the TAK-29 helmet, which was the first to use air inflation for fitting the helmet snug to the head. The TAK-29 shell, like the TK2, displayed the protective polycarbonate plastic, in addition to including tough shock and cut-resistant face-mask attachment straps.

d.    In 1973, the Defendants developed, designed, manufactured, sold, and/or distributed an air cushion helmet (known as the Pac-3) whose interior system consisted of individual vinyl air cushions with layers of fitting and energy absorbing foam.

e.    In 1982, the Defendants developed, designed, manufactured, sold, and/or distributed a M155 helmet model with a combination of foam and liquid-filled cells used for padding.

f.    In 1992, Riddell introduced the VSR Series of football helmets. It featured their first air-fitted liner system.

g.    In 2002, the Defendants developed, designed, manufactured, sold, and/or distributed the Riddell Revolution line of helmets designed with the intent of reducing the risk of concussion.

70.    Defendants at all relevant times engaged in the business of selling, manufacturing, designing, testing, engineering, marketing, modifying, assembling, inspecting, distributing, and controlling the helmets and other similar equipment for use within the NCAA by football players including Plaintiff.

**2.    Modern Helmet Designs.**

71.    Modern football helmets' basic design elements include the use of hard plastic exterior housing materials of various stiffness to absorb the force of collision ("the shell") and an inflating system meant to ensure proper fit ("the liner").

72.    To understand the impact attenuation effectiveness of football helmets, it is necessary to examine the helmet itself. There are two basic safety components of the helmet: the shell and the liner.

73.    The object of the shell is to provide a smooth, hard outer surface, which resists penetration and is designed to distribute the impact load onto a large area. The shell will reduce the force transmitted to the liner and the head if it can effectively spread a localized impact load over a large segment of the shell. Today, most football helmet shells are typically constructed

with polycarbonate or thermoplastic material. Thermoplastic is less rigid than fiberglass and can buckle upon impact.

74.    Football helmets also include a shock absorbing liner system.  The shock absorbing liner is positioned on the inside of the helmet to "manage" the force being transmitted through the shell. As the second line of defense, the liner provides absorption in order to manage the force transmitted to a player's head and neck. The energy of the impact is absorbed as the material in the liner system compresses. If the liner is very dense and stiff, the energy cannot be absorbed into the material and is passed through to the skull of the head. Consequently, the right choice for shock absorbing liner is one which will manage predicable levels of force in foreseeable impacts by deforming in a controlled fashion. The liner, as it is compressed, absorbs the impact force over time.

75.    The newer energy-absorbing materials within a helmet can reduce acceleration of the head-on impact by compressing to absorb force during the collision; however, not all helmets are designed equally in their ability to reduce this acceleration resulting from impact.  The characteristics or properties of the padding or cushioning used in helmet design are an important component of the liner system. Materials such as Vinyl Nitrile (VN) and more recently thermoplastic polyurethane ("TPU") have been shown to help reduce head impact acceleration by absorbing energy more effectively throughout a wider range of temperatures thus reducing force on the brain and risk of injury.[14]

76.    The goal of a helmet is to mitigate the risk of head injuries and improve the level of safety during play. To better protect against brain injuries and concussions, a well-designed helmet must therefore both absorb energy from the impact, leaving less energy for the skull and brain, and also cushion the impact to minimize the magnitude of deceleration. Other advances include increases in the size and coverage of the helmet which provide more space for better liner materials such as thermoplastic shock absorbers filled with air such as those depicted below:

---

[14] G. Gimbel, *et al., A Comparison between Vinyl Nitrile Foam and New Air Chamber Technology on Attenuating Impact Energy for Ice Hockey Helmets*, INTERNATIONAL JOURNAL OF SPORTS SCIENCE AND ENGINEERING, Vol. 02, No. 3, pp. 154-161 (July 2008).

77.    Even though recent engineering advances made by helmet manufacturers have undoubtedly improved the overall performance of the football helmet, industry experts acknowledge that helmet manufacturers communicate a level of protection that they do not provide, in part because of lax industry standards and practices.

78.    However, when newer materials exist (such as TPU cushioning and/or air-filled shock absorbers that are capable of absorbing energy in a more efficient manner and more effectively throughout a wider range of temperatures than traditional foam padding), a helmet manufacturer has a duty to incorporate and utilize those materials in their liner systems to better protect their helmet users.

**D.    Riddell knowingly capitalizes on the growing concussion crisis by promoting a false sense of protection in their helmets.**

79.    The issue of concussions, their debilitating effects both long and short-term, and player safety at all levels of sport are front and center stage and continue to receive increasing attention. One significant reason for this increased awareness of concussions is due to the publicity and media attention on concussions in professional sports, such as the NFL, and the long-term catastrophic effects of repetitive concussive injuries.

80.    In order to take advantage of the increased concern and awareness of concussions and their potentially devastating effects, Riddell sought to profit through the production, marketing and sales of equipment that they claim can reduce the frequency and/or severity of concussions. Despite the marketing hype as to how modern helmets reduce the incidence and severity of concussions, the rate of concussions amongst football players continued to rise.

81.    In 2002, the Defendants released a new helmet, ambitiously called the "Revolution," specifically manufactured, designed, and marketed to "reduce the incidence of concussions" as "a first- of-its-kind helmet." This h= would become the most widely used helmet in the NCAA and earn millions in sales to players in college, high school and youth leagues.  To the contrary, court documents recently made public during a Colorado lawsuit against the Defendants revealed that Biokinetics sent Defendants a report in 2000 showing that no football helmet, no matter how revolutionary, could prevent concussions. Despite the findings of this

report, Defendants were not deterred from marketing their helmet as protection against concussions.

82.    As part of their effort to capture the largest share of the helmet market, Defendants decided to conduct what would *appear* to be a scientific study regarding the purported concussion protective benefits of the Revolution helmet.

**1.    The UPMC Study and Misleading Marketing Campaign.**

83.    Following the release of the Revolution helmet, Defendants funded research at the University of Pittsburgh Medical Center ("UPMC Study") to study its helmet. The findings of the study were published in the February 2006—four years after Riddell began marketing it—in the issue of the scientific journal Neurosurgery.[15] Based on the UPMC Study funded by a grant from Riddell and co-authored by Riddell's senior vice president for research and development, Thad Ide, Riddell began to tout the Revolution helmet as reducing concussions by 31%.

84.    The UPMC Study was flawed from the start and presented significant potential conflicts of interest. Commencing in 2002, the authors of the UPMC Study compared the concussion rates and recovery time for athletes wearing *new* Riddell Revolution helmets to athletes wearing what was referred to as *traditional* helmets. The "traditional" helmets were not new, although Riddell claimed that they were reconditioned.  Reconditioning involves cleaning, sanitizing, inspecting, repairing (if necessary) and recertifying the helmets but rarely does the process involves replacing the foam padding in the liner system of the helmet, a critical part of the helmet that wears out and degrades over time.

85.    Defendants provided a grant to pay the salary of two leading authors of the study. A third author, Thad Ide, is a Riddell employee. Defendants' payment of the salaries of Collins and Lovell is a significant potential conflict of interest that was subsequently raised by many commentators regarding the study. Of equal or greater concern is the fact that Riddell directly employed the third researcher – Thad Ide, the owner of the patents covering the Revolution

---

[15] M. Collins, *et al, Examining Concussion Rates And Return To Play In High School Football Players Wearing Newer Helmet Technology: A Three-Year Prospective Cohort Study*, NEUROSURGERY, Vol. 58, No. 2. (February, 2006).

helmet. Ide, as owner of at least two patents covering the helmet, had a direct financial stake in the positive outcome of the study. In its marketing campaign, Defendants failed to disclose to its helmet users the potential conflicts of interest as well as significant limitations in the study's design and outcome.

86.    In addition, three of the study's authors are co-owners of ImPACT, a company that manufactures and distributes computerized neurocognitive testing software. Upon information and belief, ImPACT and Riddell entered into an agreement whereby Riddell would receive a commission for any ImPACT sale that is completed through a Riddell initiated contact. The authors used ImPACT concussion management software for the UPMC Study, but given Riddell's direct financial interest in the success of ImPACT, there is a serious question as to whether the software is effective and useful in a study of this nature. In fact, many in the science community have questioned the reliability and validity of ImPACT's software noting, "the vast majority of studies evaluating ImPACT have been written by the very researchers who developed it."[16] Likewise, in 2007, an ESPN.com investigation found that "on at least seven occasions since 2003, Lovell has authored or co-authored studies on neuropsychological testing, including papers directly evaluating ImPACT, without disclosing his roles in creating and marketing ImPACT."[17]

87.    Beyond the financial conflicts of the study, the study was a "prospective cohort study," not a random study that focused on a subset of high school players in the Pennsylvania Athletic Association. From 2002 to 2004, the study tracked approximately 2,000 high school football players, with slightly more than half wearing Defendants' new Revolution helmets and slightly fewer wearing "traditional" helmets. The traditional helmets were drawn from the schools' inventories and were not new. The study participants were also not randomly assigned helmets which represent a significant limitation in the study design and use of study data.

///

---

[16] *See* http://espn.go.com/espn/otl/story/_/id/8297794/neuropsychological-testing-concussions-not-panacea.

[17] *Id.*

88.     The final three-year study considered only 2,141 of the 2,207 participants, with 1,173 fitted with the Revolution and 968 fitted with traditional helmets. Using these numbers, as opposed to the total number of participants, the concussion rates were 5.3% and 7.6% respectively, which the authors described as a "statistically significant difference." According to two of the study's authors, the results "demonstrated *a trend* toward a lowered incidence of concussions" but the "limited size sample precludes a more conclusive statement of findings at this time." This is a critical and dispositive limitation that Defendants ignored and/or concealed when marketing the line of Revolution helmets.

89.     Indeed, Defendants ignored other warnings by UPMC about exploiting the data in scientifically inappropriate ways. The authors of the UPMC Study not only disputed the 31% figure, but notified the Defendants that "this data should not be used as a marketing ploy or marketing tactic from a scientific paper that was done not for those purposes." One of the authors, Dr. Joseph Maroon, later responded that the study actually stated that an athlete wearing the Revolution helmet was associated with "approximately a 31% decreased relative risk and 2.3% decreased absolute risk for sustaining a concussion in the study."  By focusing solely on the larger number, which referred to a relative decrease in risk, and without acknowledging the study's limitations, Defendants exaggerated any benefits.

90.     In addition, Dr. Robert Cantu, a neurosurgeon and leader in the field of sports-related concussion research, wrote a comment published in Journal of Neurosurgery that the study contained a "serious, if not fatal methodological flaw." The study was flawed in that it compared the performance of the new Riddell Revolution helmet with players wearing used and reconditioned helmets of unknown age and condition. Dr. Cantu further stated it was "impossible to compare the two" and to be "cautious in drawing any conclusions from this type is study."

91.     Nevertheless, the 31% concussion reduction claim was the centerpiece of the Defendants' marketing campaign, which fueled sales of the Revolution helmet model. Defendants launched a media campaign featuring the concussion reduction claim which, according to its ''Riddell Revolution UPMC Media Campaign Highlights'' video news release,

created ''over 60 million media impressions, nearly 150 television placements, over 100 newspaper clips, over 250 on-line placements, [and] 6 live sports radio interviews."[18]

92.    In its marketing campaign, Defendants did not, in any way, disclose the warnings about the UPMC Study given to them by the two non-Riddell employee authors. Nor did Defendants disclose that the statistical difference was only arrived at by analyzing an incomplete set of the data population or other limitations in the study's design. For example, during the study's peer review process for publication in *Journal of Neurosurgery*, a reviewer criticized the difference in the age of the helmets used, noting that "it is well recognized that a new football helmet has a lower [severity index] rating than an older helmet. This is why helmets are recertified after a period of years. We know the Riddell helmets in this study are new but we have no mention of the other helmets. This invalidates any comparison."

93.    In a recent patent infringement case between Riddell, Inc. and Schutt Sports, Inc., Riddell's senior vice president for research and development, Thad Ide, testified that Riddell's sole basis for the 31% reduction in concussion claim was the UPMC study by Dr. Collins.[19] "There are no other bases for the specific 31 percent reduction claim."[20]

94.    In 2011, a Congressional hearing was held on the topic of "Concussions and the Marketing of Sports Equipment" which cited yet another example of Defendants' misleading advertising taken from its website that failed to disclose Riddell's role in funding and writing the UPMC Study includes:

> ''An extensive long-term study by the University of Pittsburgh Medical
> Center was published in the February 2006 issue of Neurosurgery. The
> results were impressive: Players wearing the Riddell Revolution football
> helmet were 31 percent less likely to suffer a concussion than athletes who
> wore traditional or standard football helmets. For athletes who had never
> suffered a previous concussion, wearing the Riddell Revolution decreased

---

[18] Concussions and the Marketing of Sports Equipment: Hearings before the Committee on Commerce, Science, and Transportation, Senate, 112th Cong., 6 (2011) (Statement of Hon. Tom Udall, U.S. Senator from New Mexico).
[19] *See Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 977 (W.D. Wis. 2010) (Ides Dep. 221:24-222:8.).
[20] *Id.* (Ides Dep. 222:17–18.)

their relative risk of concussion by 31 percent. . .''[21]

95.     Even more alarming was Defendants use of the 31% reduced risk of concussion claim to sell helmets *that were not actually tested in the UPMC Study*. The UPMC Study only tested the Riddell Revolution helmet, but not the Revolution Speed, the Revolution IQ, the Revolution IQ Hits, and the Revolution Youth. Nevertheless, Defendants falsely marketed the complete Revolution line of helmets as having "concussion reduction technology."

96.     In yet another example of Defendants' misleading advertising campaign, Riddell's online store and website advertised the following:

> Based on the same technology that made the varsity Riddell Revolution helmet possible – we offer in a Youth version – the Riddell Revolution Youth. . . . After an extensive long-term study by the University of Pittsburgh Medical Center was published in the February 2006 issue of Neurosurgery. The results were impressive: research shows a 31 percent reduction in the risk of concussion in players wearing a Riddell Revolution football helmet when compared to traditional helmets.
>
> * * NEUROSURGERY, FEBRUARY 2006, VOL. 58, NO. 2''[22]

97.     As a result of Defendants' misleading 31% anti-concussion marketing campaign, sales increased across all helmet product lines. Sales of Revolution helmets skyrocketed to more than 2 million sold between 2002 and 2009 and included many helmets that were marketed as having "concussion reduction technology" even though they were not used in the UPMC Study.

98.     In 2007, NOCSAE's technical director, Dave Halstead, told the New York Times in a story entitled "Studies for Competing Design Called Into Question'' that '' . . . the [Riddell] Revolution is a good helmet. . . . But I have problems with that particular [2006 Neurosurgery] study. The helmet is not shown to do what they say it does.'' Public statements from the UPMC Study authors and other helmet safety experts have overwhelming called into question whether there is competent and reliable scientific evidence to substantiate Defendants' marketing claim.

///

---

[21] *See* http://www.eastonbellsports.com/brands/riddell, accessed Oct. 19, 2011.
[22] *See* https://shop.riddell.com/riddell/app/displayApp/%28cpgsize=20&layout=7.07_2_3_75_12_13_67_77_6_4_5&carea=0000000002&cpgnum=1%29/.do?rf=y, viewed Oct. 17, 2011.

COMPLAINT FOR DAMAGES
3:17-cv-00457

99.    Despite the well-publicized criticisms concerning the UPMC Study, the Chief Executive Officer of Riddell, Dan Arment, spoke before members of the House Judiciary Committee on January 4, 2010 at a hearing concerning "Legal Issues Relating to Football Head Injuries." In his testimony, he stated:

> "We have independent, peer-reviewed, published research in the medical journal Neurosurgery, February of 2006, showing that the Revolution [helmet] reduces the risks of concussions by 31 percent when compared to traditional helmets. . . . Today, over one million high school, college, and professional players have made the switch from traditional helmets to the Revolution family of helmets."[23]

100.    As Revolution helmet sales continued to soar, Defendants' anti-concussion claims caught the attention of the Senator Tom Udall (D-MN) who sent a letter to the Federal Trade Commission ("FTC") requesting an investigation into what he called "misleading safety claims and deceptive practices in the helmet industry." Senator Udall was quoted as saying "several helmet manufacturers advertise helmets as built with "concussion reduction technology" or "designed with the intent to reduce concussions." These helmets are also marketed as meeting the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") voluntary industry standard for football helmets. However, this football helmet standard does not specifically address concussion risks."

101.    The FTC investigation focused on the flaws in the UPMC Study, and the FTC determined that the limitations of the study were sufficiently serious to preclude the conclusion made by Defendants that the design of the Revolution helmets was responsible for any purported difference in the concussions rates experienced.

102.    Instead of contesting the FTC's findings or its criticisms of the UPMC Study's methodologies and unreliability, Defendants instead chose to wholly abandon making the 31% concussion reduction claim. From 2006 until early 2011, Defendants misrepresented the UPMC Study results and the protective capability of its Revolution helmets to increase its sales.

---

[23] Legal Issues Relating to Football Head Injuries (Part II & II): Hearings before the Committee on the Judiciary House of Representatives, 111th Cong. 347-48 (October 28, 2009 and January 4, 2010) (Testimony of Dan Arment)

Amazingly, Defendants continue to make the broader "concussion reduction technology" claim which continues to create a false sense of protection against concussions.

103.    In the wake of concussion reduction claims made by certain equipment manufacturers, Mike Oliver, NOCSAE executive director issued the following warning:

> "Because of the efforts of researchers, manufacturers and others, the progression and improvement of football helmets over the last 20 years has been remarkable. We have no doubt that technology will continue to improve. But claims or representations that a particular helmet is anti-concussive or concussion-proof, without scientific support, can be misleading and dangerous."[24]

104.    Defendants have long since been aware that their football helmets cannot actually reduce the frequency of concussions; however, Defendants have continuously marketed their Revolution helmets as having "concussion reduction technology" thus promoting a false sense of security to football players, equipment managers, colleges and the public.

105.    Defendants' marketing efforts—however misleading—paid off. According to 2013 trial testimony in *Ridolfi v. Riddell*, a case that eventually settled in Colorado State court, Nelson Kraemer, the Riddell corporate representative, testified that Riddell holds an approximately 50% market share of football helmets sold in the United States. Upon information and belief, Defendants also have a dominant market share – well over 50% – of the football helmet market.

**E.    Since its Inception, Riddell has Continuously Promoted its Helmets as Safe Yet it Failed to Properly and Adequately Warn of the Dangers and Risks Associated with Concussions.**

106.    The company was started by John Tate Riddell. Riddell first invented the removable cleat and then went on to invent the first ever plastic helmet in 1939.[25]

107.    In the early 1940s, Riddell invented the first plastic suspension helmet followed by a series of newer models with different designs and liner systems such as the TAK-29, Pac-3, M155, VSR Series to the Revolution line of helmets released in 2002.

---

[24] *See* http://www.mshsaa.org/resources/pdf/NOCSAENews_242011.pdf
[25] *See* http://www.riddell.com/history#

108.    In 1962, Riddell designed and began using an open/closed cell foam and composite liner system in its football helmets to increase the efficiency of the webbed suspension.

109.    In 1982, Riddell developed, designed, manufactured, sold, and/or distributed a newer model football helmet, the M155 that utilized a polyurethane front pad and updated suspension system with a combination of foam and liquid-filled cells used for padding.

110.    In 1992, Riddell introduced the VSR Series of football helmets. It featured their first air-fitted liner system.

111.    Throughout Riddell's history, the company has continuously marketed and advertised its football helmets to the public as "SAFE" as depicted in the advertisements below:

112.    Riddell's helmets had become synonymous with the football-safety legacy built up by this 50-year advertising campaign. And in 1989, Riddell's notoriety reached new heights through its signing of an exclusivity agreement with the NFL.

113.    According to Riddell's website, the VSR-4 helmet dominated the football landscape during its time and was used by 60% of players in the NFL, and nearly the same levels of market share where achieved in both college and high school helmets made by Riddell.

114.    Throughout the 1980s and 1990s, the helmet warnings on Riddell helmets mentioned nothing about concussions. In fact, prior to 2002, Riddell's label stated:

> "Do not use this helmet to butt, ram or spear an opposing player. This is in violation of the football rules and such use can result in severe head or neck injuries, paralysis or death to you and possible injury to your opponent. No helmet can prevent all head or neck injuries a player might receive while participating in football."

115.    It was not until the release of the Revolution in 2002 that Riddell's helmets contained the limited warning which is still inconspicuous, still incomplete, non-permanent and still otherwise- deficient:

///

///

///

///

NO HELMET CAN PREVENT SERIOUS HEAD OR NECK INJURIES A PLAYER MIGHT RECEIVE WHILE PARTICIPATING IN FOOTBALL.
Do not use this helmet to butt, ram or spear an opposing player. This is in violation of the football rules and such use can result in severe head or neck injuries, paralysis or death to you and possible injury to your opponent.
Contact in football may result in CONCUSSION-BRAIN INJURY which no helmet can prevent. Symptoms include: loss of consciousness or memory, dizziness, headache, nausea or confusion. If you have symptoms, immediately stop playing and report them to your coach, trainer and parents. Do not return to a game or practice until all symptoms are gone and you have received MEDICAL CLEARANCE. Ignoring this warning may lead to another and more serious or fatal brain injury.

116.     Riddell marketed the Revolution helmet as having "concussion reduction technology" despite having knowledge to the contrary. Riddell's helmets were advertised as a safe and effective means to reduce the likelihood and/or mitigate the risk of injury but knew that their helmets did not provide sufficient protection from the inherent dangers associated with concussions and repetitive brain trauma.

117.     Riddell's helmets were insufficiently capable of providing full protection against the risk of concussions and Defendants knew of these limitations.

118.     Riddell breached their duty to properly educate and/or properly warn their helmet users of these dangers. Such a warning should alert, inform, and/or remind Riddell's helmet users of the hazards associated with the product's use, the recommended methods of using the product, certain limitations or restrictions placed on its use, procedures for properly fitting or adapting the product to an individual user, procedures to be followed if an injury (or suspected injury) occurred while using the product, and admonitions regarding how and when an injured football player might return to the activity after recovery from the injury.

119.     Riddell failed to include adequate warnings – in the form of on-product labels affixed to different portions of the helmet – that would alert and/or inform football players of the true risks and hidden dangers associated with concussions, brain injuries and repetitive brain trauma.

120.    Riddell failed to disclose that the helmets as supplied did not perform in the manner represented. By failing to provide adequate warnings, Riddell created and profited off of a false sense of protection and led players such as Plaintiffs to take more risks as opposed to mitigating such risks.

121.    At bare minimum, Riddell's warnings should have: a) been conspicuous and noticeable to those needing to be warned; b) explicitly identify the hazards; c) stated the consequences associated with coming into contact with the hazards; and d) advised the user as to how to avoid being exposed to or affected by the hazards.

122.    Riddell's helmet warnings pre- and post-2002 were inadequate based upon warning and design defects or deficiencies that failed to include the above-referenced considerations and Riddell knew or should have known of the product warning deficiencies and failed to adequately correct these deficiencies at any time during the initial warning label design and after becoming aware of the dangers and risks associated with repetitive head impacts and concussions.

123.    Riddell breached their duty to ensure that any hazards contained in or associated with the foreseeable use of their products are properly mitigated. Methods of hazard mitigation include: a) designing out or eliminating those hazards; b) modifying the product so that users are protected or shielded from exposure to the hazards; and c) by instructing users how to properly use their product, and/or by adequately warning users of the hazards they are likely to face when using the product.

124.    Riddell's inadequate warnings failed to comply with established standards or generally recommended practices regarding the form, configuration, and content of precautionary messages and/or safety instructions.

125.    Riddell was fully aware of and yet failed to adequately warn, protect and educate NCAA football players, including Plaintiffs and, to the dangers and increased risks of repeated traumatic head impacts and development of neurodegenerative disorders and diseases.

126.    One example of the important roles and responsibilities helmet manufacturers have to their helmet users was recently shared by Mr. Vincent Ferrara, CEO of Xenith, LLC.

Mindful that previous helmet improvements have occasionally led athletes to feel a false sense of security and take more risks, Ferrara said "part of his rollout plan would be to emphasize to players and coaches proper, head-up tackling technique, so that the helmet sees fewer dangerous hits to begin with – as well as encouraging athletes to admit when they think they might have a concussion. The educational side of it is just as important, *if not more important*, as the helmet itself." (emphasis added).[26]

127.    Riddell had a duty to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football but breached their duty to Plaintiffs by placing deficient and/or inadequate warning labels on their helmets.

**F.    The Defective Helmet Liner System.**

128.    Not only was Riddell's warnings pre- and post-2002 inadequate, but Riddell has continued to utilize substandard materials in their helmet liner systems. These substandard materials are less effective at absorbing energy, and thus substantially less likely to reduce the forces transmitted to a player's head from both linear and rotational impacts and mitigate the risk of injury, i.e. concussions.

129.    As early as 2000, Riddell was on notice that newer and better energy absorbing materials were available for use in their helmet liner systems. In November 1999, Riddell's consultant Biokinetics examined four different liner materials and configurations and sent Riddell a memorandum recommending a newer material, Vinyl Nitrile (VN), as the best material for use in their football helmets.

130.    Despite these recommendations, Riddell has continued to use urethane foam in the front pad over newer materials such as Vinyl Nitrile which perform better at attenuating energy at a wider range of temperatures thereby reducing force to the forehead. The proper selection of foam padding for the front pad of the liner system is extremely important because players sustain the majority of impacts to the forehead area, which is also the thinnest layer

---

[26] *See* Schwarz, Alan, "Helmet Design Absorbs Shock in a New Way," New York Times (October 27, 2007).

between the skull and brain.

131.    Upon information and belief, Riddell utilized urethane foam padding in the front pad of their VSR helmet model until that model was discontinued in 2011, and continued the use of the same urethane foam padding in the front pad of the Revolution helmets (from 2002 through present).

132.    Upon information and belief, Riddell designed, developed and/or manufactured their own urethane foam pads until 2006. Riddell then began using a third-party supplier to develop, manufacture and/or supply urethane foam pads for use in the line of Revolution helmets.

133.    Upon information and belief, Riddell has continued to use a urethane foam in the front pad even though newer and safer materials exist that can be used at similar costs. For example, hockey helmets containing Vinyl Nitrile pads date back to the early 2000's and Vinyl Nitrile pads were not only available but were used in the rear and/or side pad components of the Revolution helmet.

134.    Upon information and belief, Riddell began using Vinyl Nitrile in the rear and/or side pad components of the Revolution helmet as a means to better protect against rotational forces that can cause concussions. Furthermore, upon information and belief, Riddell used Vinyl Nitrile in the front pads of their lacrosse helmets instead of traditional urethane foam padding.

135.    Upon information and belief, Riddell has faced multiple lawsuits since the mid-1990s whereby plaintiffs' alleged the use of defective liner materials, in particular the front pad of the helmet that increased risk of injury and/or contributed or caused the plaintiffs' brain injuries. For example, in the Colorado case Ridolfi v. Riddell, Inc., et al., the plaintiff's experts performed a materials comparison analysis and concluded that use of Vinyl Nitrile for the front pad instead of the urethane foam front pad used in the Revolution helmet at issue would have provided significantly better protection against brain injury. The analysis concluded that the Vinyl Nitrile padding was able to attenuate and absorb energy at a better rate across a wider range of temperatures and conditions than the urethane foam used in the front pad of Revolution helmet.

136.     In addition to Riddell's use of a substandard material in the front padding component of the defective liner system, Riddell's disregard for advancing technologies is exhibited by their choice to not utilize newer and safer materials in the rear and/or side pad components of the Revolution helmet. For example, Riddell has failed to incorporate newer, safer and better energy absorbing materials such as air-filled chambers and/or thermoplastic polyurethane ("TPU") padding throughout the helmet liner system.

137.     In a recent New York Times article that discusses the energy absorbing characteristics of helmet liner materials, another helmet manufacturer, Xenith LLC, recommended the use of thermoplastic shock absorbers throughout the liner system because these air-filled absorbers were capable of distributing a wider range of forces in a manner that reduced forces transferred to the head. Laboratory tests performed by Xenith, LLC showed that the thermoplastic disks could withstand hundreds of impacts without any notable degradation in performance, a drawback commonly found in traditional and/or urethane foams.

138.     Another helmet manufacturer, Schutt Sports ("Schutt") developed a liner system that incorporates thermoplastic polyurethane ("TPU") cushioning to attenuate energy as well as foam-filled air bladders for better fit. Schutt began using TPU technology in their helmet liner systems in 2003 because independent laboratory testing showed that TPU padding was superior to traditional foam padding by providing better impact absorption, better heat management and better hygienics.

139.     More recently, other studies have shown that TPU air chamber technology is able to absorb more energy and perform better throughout more impact conditions than traditional foam padding.

140.     The importance of the helmet liner system and use of adequate liner materials is twofold. First, if the density of the liner pads is too soft for a given impact, the pads will compress too quickly and bottom-out; whereas, if the liner density is too hard for a given impact, the liner pads will fail to compress and mitigate the energy and forces distributed to the player's head. Thus, it is critical for a helmet to incorporate the right choice in liner materials/padding because the energy absorbing material is able to manage the impact over a longer period of time,

helping reduce the forces of energy from both linear and rotational impacts and thereby mitigating the risk of injury.

141.    Replacing traditional foam padding contained in a helmet's liner system with new technology such as air-filled materials and/or TPU materials will not only reduce the risk of brain injury, but has been shown to maintain its energy absorbing characteristics over a longer period of time. This is important because once a helmet is put in use by high schools, colleges and/or professional football leagues it is typically reconditioned every one to three years to ensure it meets NOCSAE certification standards.

142.    According to Dave Halstead, NOCSAE technical director, the reconditioning process involves cleaning the helmets, replacing bolts and other hardware and undergoing random drop testing to meet the agency's severity index standards. However, the process does little to address the foam padding that degrades over time and provides less protection against lower-level impacts that cause concussion.

143.    Riddell has known that different helmets, by design, provide different levels of absorption which can therefore reduce the amount of force transferred to a player's head and spine. Nevertheless, instead of constantly striving to improve upon the helmet's liner system and energy absorbing materials to reduce the force of impact, Riddell has haphazardly modified the liner systems with substandard materials in various helmet models like the VSR Series and/or line of Revolution helmets.  Riddell has essentially ignored any opportunity to improve upon the helmet liner system and design performance to reduce a player's risk of brain injury and concussions.

144.    The ultimate goal of a helmet should not be to simply pass the certification standards, but rather to protect the player throughout the widest range of injurious impact conditions possible and mitigate the risk of head injury and improve the level of safety during play.

145.    Riddell has failed to meet this goal by continuing to use a defective liner system comprised of substandard materials that do not attenuate energy in an efficient and effective manner to reduce the force transmitted to a player's head and minimize the risk of injury.

**G.      Riddell Assumed a Leadership Responsibility for Educating Their Helmet Users and Promoting Safety in Collegiate Sports But Failed at all Levels to Provide Adequate Warnings and Prudent Concussion Management Tools.**

146.    Despite Riddell's superior knowledge about the risks associated with concussions and repetitive head impacts, Riddell has never warned Plaintiffs or former professional football players of the long-term health effects of concussions.

147.    In 1989, Riddell partnered with the NFL and became the League's official helmet. The NFL formed the Committee on mild traumatic brain injury ("MTBI") in 1994 in response to a growing number of concussions. One of the committee's stated goals was to improve understanding of the biomechanics of concussions, and to use that information to engineer a concussion-resistant helmet. Riddell worked closely with the NFL to conduct research and share data on helmet design and safety.

148.    During the Congressional Hearings in 2010, Riddell's President Dan Arment testified that, "for more than 70 years Riddell has passionately been at the forefront of providing state-of-the-art helmet technology," and "as a market leader, we have always felt we have an obligation, not just as a business but in the public interest, to collaborate where possible and maintain the highest standard of innovation and research that has continued to stand the test of time, scrutiny and independent research…"

149.    Over the years, Riddell has continuously represented itself as a market leader that formed significant partnerships with a number of organizations including USA Football, American Youth Football, the NFL, the NFL Players Association, Collegiate and National Athletic Trainers' Association to promote player education.

150.    Riddell's voluntary actions and authority throughout its history demonstrate that for over 70 years, Riddell shouldered the common law duty to make the game of football safer for the players through advancements in helmet technology and to keep the players informed of safety information.

151.    By voluntarily undertaking to study and report on the issue of concussions and helmet safety in football, Riddell assumed a duty to exercise reasonable care in their work and

their public statements about a helmet's ability to effectively reduce the risk of concussion.

152.    Plaintiffs did not know, appreciate or understand the long-term impact of concussions and relied on Riddell to provide the protection that they promised.

**H.    Riddell was in a superior position of knowledge and authority and owed a duty to Plaintiffs.**

153.    The high incidence of concussions among football players has been well known to the Riddell.  Riddell had a duty to adequately inform and warn football players of the risks associated with concussions. Players and their families have relied on the Riddell to disclose relevant risk information and protect their health and safety through instruction, counseling, and proper use of their products.

154.    Riddell accumulated knowledge about head injuries to football players and the associated health risks therefrom, was at all times superior to that available to former football players.

155.    Riddell studied the biomechanics of head movement. Riddell knew or should have known that traumatic brain injury generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

156.    Riddell knew or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

157.    Riddell knew or should have known for many years that once a person suffers an MTBI, he is up to four (4) times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI, and the injured person requires more time to recover.

158.    Riddell knew or should have known for many years that NCAA football players and their families were unaware of the serious risk posed to the players' long-term cognitive health, caused by repeated head impacts while playing football.

///

159.    Riddell knew or should have known for many years that clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during a football player's career can cause severe cognitive problems such as depression, early-onset dementia, Parkinsonism, ALS, among other serious neurological conditions.

160.    Riddell knew or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub- concussive blows and concussions) cause ongoing and latent brain injury. These injuries have been documented and associated with sports-related head impacts in both football and boxing since 1963.

161.    Riddell knew or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE"). CTE is also associated with an increased risk of suicide.

162.    Riddell knew or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Conclusive studies have shown that this condition is prevalent in retired professional football players who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

163.    Riddell knew or should have known the helmet standards set forth by NOCSAE are not designed to rate protection against concussions.

///

164.     Riddell knew or should have known that helmets without a proper liner system are ineffective in reducing both linear and rotational forces that result in a concussions and/or brain injuries.

165.     Riddell knew or should have known that materials such as Vinyl Nitrile and/or thermoplastic polyurethane ("TPU") are better at absorbing energy throughout a wider range of temperatures and provide better protection against head impacts when used throughout liner systems of football helmets than the materials Defendants used in the VSR Series and Revolution line of helmets.

166.     Riddell knew or should have known that helmets designed with materials such as thermoplastic polyurethane provide a safer means of attenuating and absorbing energy thereby reducing forces and energy directed to a player's head and minimizing the risk of head injuries.

167.     Riddell knew or should have known that there is no definitive scientific research to support claims that football helmets can protect against or reduce the frequency of concussions.

168.     At all times herein mentioned, Riddell was fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent partner of Riddell or the other Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of the actions and all Defendants and each of them, thereby ratified those actions.

169.     The harm, which has been caused to Plaintiffs, resulted from the conduct of one, or various combinations of the Defendants, through no fault of Plaintiffs.

170.     Riddell was under a continuing duty to disclose and warn of the true character, quality, and nature of the after effects of head injuries. Because of the Riddell's deceitful and fraudulent concealment and failure to warn of the true character, quality, and nature of the dangers and risks inherent in the sport of football, from which no helmet could protect Plaintiffs, Riddell is estopped from relying on any statute of limitations defense.

171.     As a direct result of the material misrepresentations by the Riddell, former players have for many decades been led to believe that the symptoms of early-onset dementia, ALS, loss of memory, headaches, confusion, and the inability to function were not caused by events

occurring while they played football in the NCAA. And, as a result of this willful and malicious conduct, these former players including Plaintiffs have been deprived of medical treatment, incurred expenses, lost employment, suffered humiliation, and sustained other damages to be specified.

## V.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

172.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

173.    Riddell was negligent in the design, testing, marketing, and engineering of the helmets as described herein.

174.    Riddell owed a duty of care to the Plaintiffs in the design, testing, marketing, and sale of the helmets and all components and sub-assemblies of the helmets.

175.    Riddell was or should have been aware that repeated blows to the head can cause to long-term brain and neurocognitive injuries in its customers, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms. Riddell breached its duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football using their helmets.

176.    Riddell failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

177.    Riddell possessed special and superior knowledge of the potential risks and substantial dangers to users of its football helmets, but negligently and carelessly failed to adequately warn or instruct users of the potential risks and dangerous and defective conditions of their above-described football helmets including but not limited to helmets with a safer means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the

forces and energy directed to the player's head.

178.    As a result of Riddell's breach of duty, Plaintiffs have suffered harm described above.

179.    Furthermore, because Plaintiffs did not know, nor could they have discovered through the exercise of reasonable diligence that Riddell's breaches and misrepresentations increased Plaintiffs' risk and exposure to traumatic brain injuries as a result thereof, any applicable statute of limitations is tolled by Riddell Defendants' misconduct and concealment of information.

**COUNT II**

**<u>DESIGN DEFECT</u>**

180.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

181.    At the time the Riddell helmets were designed, manufactured, sold, and distributed by the Defendants, the Pac-3, M155, VSR Series and Revolution line of helmets were defective in design, unreasonably dangerous, unsafe for their intended purpose, and failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner because the helmets did not provide adequate protection against the foreseeable risk of concussive brain injury. Riddell acted unreasonably at the time of design in light of the foreseeable risk of injury from the use of their helmets. Any purported benefits in the design of the Pac-3, M155, VSR Series and Revolution helmets do not outweigh the risk of danger inherent in their defective design.

182.    The design defects include, but are not limited to the following:

a.      Negligently failing to design any of its helmet-system's front padding with materials capable of distributing force;

b.      Negligently failing to consistently test helmet systems in non-ambient temperatures, thereby capable of adducing product-performance information;

c.      Negligently failing to design an adequate and comprehensive warning

39

COMPLAINT FOR DAMAGES

3:17-cv-00457

system for its helmet systems appropriately tailored to the product it manufactured;

d.  Negligently failing to design liner systems in each of the subject helmet systems with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

e.  Negligently designing all liner systems within each subject helmet systems with shock attenuating system not safely configured;

f.  Negligently failing to properly and adequately inspect and/or test the helmet model;

g.  Failing to warn Plaintiffs that their helmets would not protect against the long- term health consequences of concussive brain injury;

h.  Prior to 2002, Defendants made no attempt to design a helmet to protect against concussive injuries. The helmets they designed, manufactured, sold, and distributed had insufficient padding to protect against concussive injuries;

i.  Even the Revolution helmets (introduced in 2002) were not designed to sufficiently protect against concussions as shown by the demonstration before a congressional panel, by P. David Halstead, Technical Director of Southern Impact Research Center ("SIRC") on January 4, 2012;

j.  Failing to warn Plaintiffs that Revolution helmets were not significantly safer against sub-concussive impacts and concussive blows than other helmet systems on the market, and in fact marketing the Revolution helmet and its progeny as being 31% safer against concussions; and

k.  Other acts of negligence that may be discovered during the course of this matter.

183.  The defective design and unreasonably dangerous condition were a proximate and producing cause of the injuries suffered by Plaintiffs and other damages, including but not

limited to, economic damages and non-economic damages.

184.    At all times, the helmets were being used by Plaintiffs for the purpose for which they were intended.

185.    Riddell is strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the injuries and other damages including, but not limited to, economic damage as alleged herein.  A safer alternative design was economically and technologically feasible at the time the product left the control of Riddell.

**COUNT III**

**<u>FAILURE TO WARN</u>**

186.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

187.    Riddell knew or should have known of the substantial dangers involved in the reasonably foreseeable use of its helmets.

188.    Riddell failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

189.    Riddell failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

190.    Riddell ignored years of published literature warning of the dangers of concussive injuries until 2002, when a warning involving return to play after a concussion was placed on all Riddell helmets. The warning was still defective and inadequate and remains today defective and inadequate because it does not warn about the later life cognitive effects of concussive injury.

191.    Riddell knew that these substantial dangers were not recognizable to an ordinary consumer or user and that such person would use these products without inspection for defects.

192.    Plaintiffs neither knew, nor had reason to know of the existence of these defects, or increased risks of harm.

COMPLAINT FOR DAMAGES
3:17-cv-00457

193.    Plaintiffs used the helmets in a foreseeable manner at all times.

194.    Plaintiffs' damages were the legal and proximate result of the actions of Riddell who owed a duty to warn Plaintiffs of the risks of substantial harm associated with the use of their products.

195.    Riddell's failure to warn proximately caused the Plaintiffs' personal injuries.

**VII.**

**DEMAND FOR JURY TRIAL**

196.    Plaintiffs demand the causes of actions alleged herein be tried before a jury.

**VIII.**

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final hearing or trial, Plaintiffs have the following:

    a.    Monetary Judgment against Defendants for a sum within the jurisdictional limits of this Court for all actual damages, both past and future, as indicated above;

    b.    Prejudgment interest as provided by law;

    c.    Post-judgment interest as provided by law;

    d.    Attorney's fees;

    e.    Costs of suit; and

    f.    Such other and further relief, at law and in equity, to which they may show themselves to be justly entitled.

///
///
///
///
///
///
///
///

DATED: January 30, 2017

THE LAW FIRM OF JOSEPH H. LOW IV

By:___*/s/ Joseph H. Low IV*_____

Joseph H. Low IV (SBN 194897)
100 Oceangate, 12th Floor
Long Beach, CA  90831
Telephone: 562-901-0840
Facsimile:  562-901-0841
Email:  joseph@jhllaw.com
*Counsel for Plaintiffs*

George Parker Young
Texas Bar No. 22184750
Vincent P. Circelli
Texas Bar No. 22184750
Kelli L. Walter
Texas Bar No. 24074576
Circelli, Walter & Young, PLLC
Tindall Square Warehouse
500 E. 4th Street, Suite 250
Fort Worth, TX 76102
Telephone:  682-703-2246
Email: vinny@cwylaw.com
*Counsel for Plaintiffs*
[Admittance *Pro Hac Vice* to be sought]